IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

SULEIMAN ABDULLAH SALIM,          )
MOHAMED AHMED BEN SOUD, and       )
OBAID ULLAH, *as personal*        )
*representative of Gul Rahman*,   )
                                  )
              Plaintiffs,         )  No. 2:15-CV-0286-JLQ
                                  )     2:16-MC-0036-JLQ
          v.                      )
                                  )
JAMES ELMER MITCHELL and          )
JOHN JESSEN, *also known as*      )
Bruce Jessen,                     )  May 5, 2017
                                  )  Spokane, Washington
              Defendants.         )
                                  )  MOTION TO COMPEL
_____      )

---------------------------------------------------------------

BEFORE THE HONORABLE JUSTIN L. QUACKENBUSH, SENIOR JUDGE
TRANSCRIPT OF PROCEEDINGS

---------------------------------------------------------------

REPORTED BY:  DOROTHY STILES, RMR, CRR
              Official Court Reporter
              509.458.3465

Proceedings recorded by mechanical stenography; transcript
produced by computerized transcription.

**APPEARANCES:**

For the Plaintiffs:            DROR LADIN
                               HINA SHAMSI
                               STEVEN WATT
                               American Civil Liberties Union
                               125 Broad Street
                               17th Floor
                               New York, New York 10004


                               LAWRENCE S. LUSTBERG
                               Gibbons PC
                               One Gateway Center
                               Newark, New Jersey 07102


For the Defendants:            JAMES T. SMITH
                               BRIAN S. PASZAMANT
                               Blank Rome LLP
                               One Logan Square
                               130 North 18th Street
                               Philadelphia, PA 19103


                               HENRY F. SCHUELKE, III
                               Blank Rome LLP
                               600 New Hampshire Avenue, NW
                               Washington, D.C. 20037


                               CHRISTOPHER W. TOMPKINS
                               Betts Patterson Mines, PS
                               701 Pike Street
                               Suite 1400
                               Seattle, Washington 98101


For the United States          ANDREW I. WARDEN
of America:                    Department of Justice
                               20 Massachusetts Avenue NW
                               Washington, D.C. 20530

**I N D E X**

**EXHIBITS:**

Court Exhibit No. 1                                    Page 67
Handwritten Note


Court Exhibit No. 2                                    Page 72
Chart entitled *48 Disputed Documents*

The above-styled cause came on to be heard on May 5, 2017, at 9:00 a.m., before the Honorable Justin L. Quackenbush, Senior Judge, when the following proceedings were had, to-wit:

LAW CLERK:  All rise.

The United States District Court for the Eastern District of Washington is now in session, the Honorable Justin L. Quackenbush presiding.

THE COURT:  Good morning.

Just be seated.

MR. LADIN:  Good morning, Your Honor.

MR. PASZAMANT:  Good morning, Your Honor.

MR. SCHUELKE:  Good morning, Your Honor.

MR. WARDEN:  Good morning, Your Honor.

THE COURT:  All right.

COURTROOM DEPUTY:  Case No. MC-16-36-JLQ, James Elmer Mitchell and John Bruce Jessen vs. United States of America; related case CV-15-286-JLQ, Salim vs. Mitchell, et al.  Time set for hearing on motions.

Counsel, please state your appearances for the Court.

THE COURT:  For the plaintiffs.

MR. LADIN:  Your Honor, this is Dror Ladin for the plaintiffs.  With me are my colleagues Lawrence Lustberg, Hina Shamsi, and Steven Watt.

THE COURT:  Maybe I didn't give you my lecture about

MOTION TO COMPEL                                                5

the -- I blame it on the acoustics, not my lack of hearing. But I spent three years in combat in Korea, with five-inch .38s going off in my ears.  And as a result of that I do wear hearing aids, but only in court and in church.  To the dismay of my wife, I might say.

So when counsel addresses the Court, I sort of enforce the podium rule.  But if it's, Mr. Ladin, just to introduce counsel, if you'll just speak into the microphone.

So let's go ahead with that.

MR. LADIN:  I apologize, Your Honor.  I'll try that again.

THE COURT:  That's all right.

MR. LADIN:  So this is Dror Ladin for the plaintiffs. And with me are my colleagues Lawrence Lustberg, Hina Shamsi, and Steven Watt.

THE COURT:  And Ms. Chiang called several weeks ago, when we set this, to explain she had serious child care issues, that she explained to the Court.  And I excused her from attending.

MR. LADIN:  Thank you, Your Honor.

THE COURT:  All right.

All right.  Next.

MR. PASZAMANT:  Good morning, Your Honor.  This is Brian Paszamant for the defense.  I'll be arguing today.  And with me are my partners Hank Schuelke and James Smith.

MOTION TO COMPEL                                          6

THE COURT:  Where is Mr. Schuelke from?  I keep track of billable hours.

MR. PASZAMANT:  Mr. Schuelke hails from just outside of Washington, Your Honor.

THE COURT:  Washington, D.C.

MR. PASZAMANT:  Correct.

THE COURT:  I suppose he paid close attention to last night's activities in Washington D.C.

MR. SCHUELKE:  I try to avoid it as much as possible.

THE COURT:  You didn't watch them on the court last night?

MR. SCHUELKE:  I did not.

THE COURT:  The Wizards.

MR. SCHUELKE:  Oh, the Wizards.  I thought you meant Congress.

THE COURT:  No, the more important part.

MR. SCHUELKE:  The Wizards, quite amazingly, for a change of pace, did not blow the big league.

THE COURT:  All right.

MR. PASZAMANT:  Your Honor, also with me is my co-counsel Christopher Tompkins from Seattle.

THE COURT:  All right.  And, Mr. Smith, where are you from?

MR. SMITH:  Your Honor, I'm from Philadelphia.

THE COURT:  Well, we've got the spectrum pretty well

covered, I guess.

Let me make a few preliminary remarks.

COURTROOM DEPUTY:  Mr. Warden.

THE COURT:  Mr. Warden, I went right by you.

MR. WARDEN:  That's all right, Your Honor.

Good morning, Your Honor.  Andrew Warden from the Department of Justice, based in Washington D.C., on behalf of the United States Government.

THE COURT:  From the Executive Branch.  And I shouldn't pass you by because you're picking up the bills.

MR. WARDEN:  To some extent, yes, Your Honor.

THE COURT:  Well, for the defense.

MR. WARDEN:  You're correct.

THE COURT:  And your time.

MR. WARDEN:  And my time.  Yes, sir.

THE COURT:  All right.  In past hearings there's been some indication of media and public interest in this case. While in the past I've tried to get counsel to focus upon the things I do, that being when people are injured and bring a civil action seeking redress for those injuries, or in this case also wrongful death, I make every effort to have counsel -- even though the issue may be of some public interest, the real merits of the case are whether or not the plaintiffs in this case were wrongfully interrogated and tortured and, in the case of Mr. Rahman, killed.

MOTION TO COMPEL                                      8

I've suggested to counsel in the past as we've had these meetings, both here in court --

Is this our second or third?  Second, isn't it?

MR. SCHUELKE:  Second.

THE COURT:  Live and in person.

I've suggested to counsel that despite the public interest aspect of this case, that the people that we all need to pay attention to are the interests of the plaintiffs in this case, who allegedly have been abused and tortured; and in the case of the wrongful death case of Mr. Rahman, allegedly killed at the hands of the defendants and/or government agents.

Because of the public interest, despite what I have attempted to do to direct everybody's attention to what the case is really about, it being a personal injury and wrongful death case, there has been media attention.  And in the past in our telephone hearings, and I believe when we were all here together last fall for our initial conference and discussion of the *Motion to Dismiss*, I have allowed the media to listen in.

Now, also in that connection I have well in mind the Judicial Conference of the U.S. prohibition of any recording of court proceedings; and, obviously, no video recording.

So those media people who we've attempted to accommodate by allowing you to listen in to this morning's proceedings must have in mind, and you have -- as I understand from Ms. Mauk, my judicial assistant, you have in writing affirmed the rules

prohibiting any recording whatsoever of this morning's proceedings.

But I'm an advocate for as much public presentation as is permitted under the rules. And that's the reason I've allowed counsel or media representatives to call in and listen to this morning's proceeding. But I stress the prohibition against recording in any manner of the court proceedings. That, of course, is done by Ms. Stiles, the court reporter.

I again commend to counsel the fact that this case is really about alleged personal injury and wrongful death. And in one of the pleadings I saw a recitation that you had taken the Court's suggestion and admonition to heart and have, in fact, discussed possible resolution. Apparently, it has not reached fruition.

But I commend to those of you having a monetary interest -- and the federal government obviously has the biggest monetary interest, in that they have indemnified the defendants against all claims. They're paying the attorneys fees.

Not many days go by in this case that I don't have another pleading from one side or the other. And I can just imagine the amount that's incurred in attorneys fees. and I'm not being critical of that at all. You have your role. But being the pragmatic judge that I am, I think about the families and relatives of the plaintiffs.

And I hope that the plaintiffs will keep that in mind,

that counsel for the plaintiffs will keep that in mind.  I don't want --

While I recognize the ACLU is involved in this case and they have interests, varied interests.  But I want to emphasize that their real interest should be that of the families and the decedent, Mr. Rahman.  And I hope that you will keep that in mind rather than making this the *cause célèbre* of was there torture or was there enhanced interrogation that amounted to torture, including the so-called waterboarding.

Now, I'm winding down with my preliminary comments, but I have one or two more.

I've read a large number of Supreme Court and Circuit decisions in this matter.  I, of course, being a judge in the Ninth Circuit, am bound by Ninth Circuit opinions.

My impression is that the decisions of the Ninth Circuit, including that latest 2009 *Mohamed* case -- that the decisions of the Ninth Circuit concerning state secrets are as conservative, if not the most conservative decisions on these state secret issues.

So I don't need to lecture counsel about the role of the Circuit and the District Court.  I, of course, have the important role of being the trial judge assigned to the case.  But when it comes down to the legal issue, if there are Circuit opinions, then we trial judges, District Court judges, are bound by the rule of law if it has been established by the

Circuit.

But once again, I reiterate, my impression is that the decisions of the Ninth Circuit on this state secrets subject are of the most conservative that I have seen of the reported cases.

One final thought for counsel for the defendants. And if we have overlooked talking with you about the availability of parties and the media listening to proceedings, I just assume that since you were aware that I have allowed media to listen to proceedings that you have chosen not to have the defendants either here --

This is a civil case, of course. They're entitled to be here or not be here; or, if asked, clearly the two defendants would be given the same opportunity to listen to the proceedings. But they, being residents of this area, obviously could come to court, if they're not here. I hope I haven't overlooked that option for counsel to exercise.

All right. With those preliminary comments --

Oh, and Mr. Slade is here from the -- I'm not sure of his formal designation or who signs the check, whether it's the Administrative Office or the Department of Justice. Be that as it may be, he's here being the custodian of the classified documents.

As we get into the issue of classified documents, I don't want to spend a lot of time -- I want to spend reasonable time

MOTION TO COMPEL                                                    12

and ample time in reviewing classified documents because I think that's appropriate. And that's something that, for example in the Ninth Circuit *Mohamed* case, the Court -- those judges of the Ninth Circuit reviewed the classified documents before they ruled that they were state secrets. And under the status of that case, that required dismissal of the claims of the injured parties against the government and Jeppesen, its agents.

One or two more morning thoughts. When we get into the privilege --

And I might say, I've read the new Director of the CIA's declaration. Director Pompeo, if I have that correct. I've read it, and it's well done and thorough. But as I was reading that, the question came to me as follows. And if counsel wishes to address this today, you may, or on another occasion.

I would assume that in the trial of this case, in this courtroom, before probably eight to ten dedicated citizens as jurors, that the plaintiffs would be on the stand testifying to what happened to them, where it was that it happened, and who did it; whether it be *eo nomine*, that being by name of the individual, or -- and I'm not suggesting that's necessary.

But I would assume that that's what the plaintiffs would do: They would get on the stand and testify, as in all civil cases, to what happened to them, where it happened, when it happened, and who did it.

MOTION TO COMPEL                                                        13

And that may be for another day.  But from my experience in these cases, and going back to my security days in the military, I have seen instances where prior to the trial of the case there is that issue raised and the Court decides it.

Now, I'm aware that in this case the two defendants, Mitchell and Jessen, signed nondisclosure agreements with the government.

From what I have seen so far, the disputed evidence from, for example, Ms. Haspel and Mr. Cotsana, whose depositions are at issue, that's merely supplemental or confirmatory of what the defendants would testify their role was; what they did independently, what they did at the direction of government CIA agents.

And in reading the declaration of the two CIA lawyers, although maybe their activities were not strictly as lawyers, Rizzo and Rodriguez -- I read their declarations.  One or both of them were deposed.

MR. SCHUELKE:  Both.

THE COURT:  Both?  Okay.

So it's not as if the challenged documents and the challenged depositions of Cotsana and Haspel would constitute the critical evidence in support of the defense of these two psychiatrists.

My impression -- so counsel knows, my impression is that what is before me today is supplemental to the testimony that

would be proffered by the defense as to the role of the two defendants in the interrogation of the two living plaintiffs and the decedent, Rahman. So I want you to know my frame of mind so you can address that.

It's the defense motion. Who wants to argue it?

MR. PASZAMANT: That would be me, Your Honor. Brian Paszamant.

Good morning again, Your Honor. Can you hear me okay?

THE COURT: No.

MR. PASZAMANT: How about now?

THE COURT: Hit the mic, would you please.

MR. PASZAMANT: I'll try to --

THE COURT: And if that other mic is a little taller, that would work.

MR. PASZAMANT: Better?

THE COURT: Better.

MR. PASZAMANT: Okay. I'll do my best, Your Honor --

THE COURT: All right.

MR. PASZAMANT: -- to keep my voice up.

Once again, good morning. And thank you for allowing me the opportunity to argue these third and fourth *Motions to Compel*.

Standing before you, Your Honor, I recognize that we put a lot of paper in front of you, as did the government. I'm pleased to report that since we started this process and the

MOTION TO COMPEL

government gave us the privilege log --

There were 250 documents on that log; 40 documents withheld in their entirety.  When we filed our third *Motion to Compel*, there were 170 documents at issue; 35 or so withheld in their entirety.

Standing here before you today, Your Honor, because of meet and confer efforts and --

THE COURT:  I've read the fact that we're down to 58.

MR. PASZAMANT:  Actually, we're down to 47, Your Honor --

THE COURT:  That's right.

MR. PASZAMANT:  With 10 withheld in their entirety.

THE COURT:  We made it to 58, and now 47.

MR. PASZAMANT:  We've continued to work, Your Honor, to try to streamline this as best we could.  And, Your Honor, the documents that remain at issue are those documents identified --

THE COURT:  Give me one moment because --

Where is that sheet that you printed out?  There was a -- here it is.

What was filed was such small print that it couldn't be read.  Fortunately, Ms. Mauk assisted you all, at her minimal hourly rate, in preparing a sheet of the 47 documents.  And I believe I have that.  So when you refer to any individual document, I now have a readable list.

This is Document 88-1 that was filed in the miscellaneous case, the 16-MC-036.

MR. PASZAMANT:  Yes, Your Honor.  I believe that was Exhibit A to the most recent status report that we filed.

THE COURT:  Yes.

MR. PASZAMANT:  And the document that has fallen away from this list actually, Your Honor, is the very first one, Document No. 37, by virtue of further disclosure made in a document provided to us by the government earlier this week.  I believe it was Tuesday.  So we're down to 47; 10 withheld in their entirety.

Also included in that status statement that Your Honor received were those items that the defendants are not contesting whereby a privilege has been asserted.  And there are 13 of those items set forth in that status report.  Things like the foreign governments that were involved in the program and so on and so forth.  There are 13 different things.

And, in fact, Your Honor, when you look at the classified --

THE COURT:  But isn't that at the heart of the government's objection?  Not just who CIA agents are as a class.  I think, as I read the director's memo --

And I might say I'll be asking Mr. Warden:  Where is it that the Attorney General has filed a declaration of the requirement in 2009 that the Attorney General sign off on

claims of privilege?

If I've missed it, Mr. Paszamant, if you're aware of any, I would like to hear from you on that.

MR. PASZAMANT:  Your Honor --

THE COURT:  I'll hear from Mr. Warden also on that.

MR. PASZAMANT:  Your Honor, standing here before you, I'm not aware of any such thing.

I know of two declarations that were filed in connection with this matter:  One by Director Pompeo; and the other by one of his subordinates.  So I'm not aware of a declaration from the Attorney General, whether it be former Senator Sessions or otherwise.

So your question was:  Well, doesn't some of what I was just articulating we're not interested in fall at the heart of the state secret assertion, as I understand it.  And I think the answer is:  Yes, it probably does, Your Honor.

And if you look at the unclassified summaries that we've been provided, many of them start with a recitation of:  Well, this document has the names of people in foreign intelligence services, and so on and so forth.

The defendants don't care about that information.  In fact, we've never cared about that information.  And we told the government that as early as June of 2016.

So to the extent that the government is asserting the state secret --

THE COURT:  These other people --

Let me get right to Rizzo and Rodriguez.

MR. PASZAMANT:  Okay.

THE COURT:  They emphatically state in their declarations that the defendants didn't do anything that wasn't previously reviewed and authorized -- I'm paraphrasing it, of course -- that wasn't previously reviewed and authorized by a CIA agent or officer.

Isn't that what they say?

MR. PASZAMANT:  In sum and substance, Your Honor, I believe that's accurate.  And each of those individuals has actually been deposed.

THE COURT:  Now, let me ask you about the claims of privilege and the testimony of the defendants.

MR. PASZAMANT:  Yes.

THE COURT:  What is your position, Mr. Paszamant, on the ability of the two defendants to testify to time, place, manner, and role of those two individuals in the interrogation program?  Are they precluded in any manner from testifying as to --

Assuming they're going to testify, "We didn't do anything on our own.  It was only done at the behest of the CIA."  Do you see any prohibition in the two defendants so testifying, if that's their testimony?

I'm not suggesting that it is, but if that's their

testimony.

MR. PASZAMANT:  Their testimony, Your Honor --

THE COURT:  And speak into that microphone.

MR. PASZAMANT:  I apologize, Your Honor.

I anticipate that my clients will testify that they had no involvement whatsoever with regard to Plaintiff Ben Soud, as well as with regard to Plaintiff Salim.

I expect that my clients will testify that with regard to Defendant Mitchell, he saw deceased Plaintiff Rahman on one occasion, for a relatively brief period of time, and suggested that Mr. Rahman get some medical treatment.  And that was essentially the role that he played, if any, with regard to Plaintiff Rahman.

Defendant Jessen, my other client, had a little bit more of a role with regard to the deceased plaintiff, Rahman.  In particular, he was involved with a couple of, I guess, interrogation sessions with him.  And he assessed him as being a challenging individual from a psychological profile.

That's what I anticipate their testimony will be.  I also suspect that they will --

THE COURT:  Can I interrupt you again?

MR. PASZAMANT:  Of course.

THE COURT:  I need to interrupt counsel and ask the questions or I'll forget them.

Mitchell wrote a book, didn't he?

MR. PASZAMANT:  Yes, he did, Your Honor.

THE COURT:  Has that book been published?

MR. PASZAMANT:  Yes, sir, it has.

THE COURT:  And what does he say in the book?

Are you suggesting that whatever he has said in the book is what his --

Or did he say anything in the book --

I haven't read it, obviously.  Did he say anything in the book that he would not be testifying to?

MR. PASZAMANT:  Your Honor, I don't --

It's been a while since I read the book.  And, of course, it's a hundred-and-some-odd pages long.

I don't believe there's anything in there whatsoever with regard to Plaintiff Ben Soud or Plaintiff Salim.  Because until my clients were sued by them, they didn't know them; never heard of them before, because they were low-value or medium-value detainees.

And my clients, as you've seen in some of the paperwork, were involved exclusively with high-value detainees, but for this brief interaction that each of them had with the deceased plaintiff, Rahman.

THE COURT:  So there's no discussion of interaction by either of the two defendants in -- in Mitchell's book, is it?

MR. PASZAMANT:  Dr. Mitchell is the one who authored

the book, sir.

THE COURT:  There's nothing in Dr. Mitchell's book that relates to specifically the three plaintiffs?

MR. PASZAMANT:  I can say that, Your Honor, unequivocally, I believe, with regard to Plaintiffs Salim and Ben Soud.  Standing here before you, I believe that there is discussion of deceased Plaintiff Rahman.

But respectfully, Your Honor, I didn't re-review the book prior to the hearing today.  So I apologize for that.

The focus of the book --

THE COURT:  Well, that query is directed, of course, as to whether or not the matters before me are now matters of public knowledge.  A lot of this has been reported not officially by the CIA, but by independent sources.

MR. PASZAMANT:  There has certainly been a lot of media attention over a long period of time, Your Honor, with regard to much of the now ended EIT program and lots of other related items.  No question about it.

Once again, I don't think there's anything in the book about two of the three plaintiffs.  And with regard to deceased Plaintiff Rahman, I believe there is material in the book relating to that.

Because, of course, he passed.  And with his passing brought about inquiries, an Inspector General investigation, and things along those lines.

THE COURT:  Is there --

Have you received from the government any statement as to restriction on the testimony of either of the two defendants?

MR. PASZAMANT:  So with regard to anything that's said in the book, my understanding is --

THE COURT:  Not just the book.  Let me broaden my question to from any source.

Have you received any statement from the U.S. Government, whether it be from Mr. Warden personally or any other representative of the United States Government, concerning restrictions on the testimony of the two defendants?

MR. PASZAMANT:  My understanding is yes, Your Honor.

Early in the case we were provided with a document which was called *Classification Guidance*.  And that was prepared by the government so as to --

THE COURT:  Well, can you be a little bit more specific?

Who provided it to you?

MR. PASZAMANT:  It was provided to me by Mr. Warden when he became involved in the case.  I believe that it was prepared by the CIA, but perhaps Mr. Warden could speak to its origins better than I can.

THE COURT:  And was that something other than the initial agreement between the government and the two defendants when they were -- when they entered into that contractual

relationship?

MR. PASZAMANT:  The *Classification Guidance*, Your Honor, purports to be instructions as to the application of the nondisclosure that my clients agreed to when they worked for the government.  So it's thou shalt not speak of this and thou shalt not speak of that.

THE COURT:  The government -- have they specifically come to you or the defense side, saying if the two doctors testify in any manner, whether it be in deposition form or at trial, they may not refer to things like the government now says through Director Pompeo's declaration, what he says are state secrets?

That being cooperation of foreign governments in the interrogation of these three plaintiffs; what country the interrogation took place in, although I think Rodriguez and Rizzo identify those countries; what role, if any, members of foreign governments played in the interrogation program.

MR. PASZAMANT:  Yes, Your Honor.  All of those items are encompassed within the *Classification Guidance* that we were --

THE COURT:  Have you discussed with the United States Government, the Executive Branch, what restrictions they contend are on these two defendants that would prohibit them from fully and frankly testifying as to their role, if any, with the three plaintiffs?

MR. PASZAMANT:  Your Honor, when my clients were deposed by the plaintiffs in this case --

THE COURT:  Were deposed?

MR. PASZAMANT:  They were, Your Honor, yes.

THE COURT:  Yes.

MR. PASZAMANT:  When they were deposed, Mr. Warden was in attendance, with many other folks, for the sole purpose of making sure that if a question was believed to elicit information that the U.S. Government perceived to remain classified, that the government could pose an objection and instruct the witness, my clients, not to answer.  So that's exactly what happened here.

THE COURT:  You didn't tell me what happened.

MR. PASZAMANT:  Well, what happened was there were instances where questions were posed to them and they were told you can't speak to that.

THE COURT:  By the government?

MR. PASZAMANT:  Correct, Your Honor.

And that's in accordance with the procedures that we had agreed to early on in this case, in May of 2016, with the government, so as to avoid an inadvertent disclosure of something the government contended was classified.

And, Your Honor, I believe that what my clients are restricted to in terms of what they can disclose is completely in line with what the government is taking the position is

MOTION TO COMPEL

25

classified now and subject to the State Secrets Privilege, whether it be with regard to my clients or the documents that we're talking about.

So, for example, no, my clients can't speak to what country they were deployed to.  They can't speak to where the black site was.

THE COURT:  Why is what country the interrogation took place in a critical matter in this personal injury and wrongful death case?

MR. PASZAMANT:  Your Honor, I don't believe it is critical except so as to establish, perhaps, that my clients were not with the plaintiffs in this case.  But it doesn't seem to be a well-kept secret at this point that my clients never met the two plaintiffs I've been telling you about.

So I don't think that's critically important, Your Honor.

THE COURT:  The country.

MR. PASZAMANT:  The country.  That's correct.

THE COURT:  All right.  How about the next question, participation by any representative of any other foreign government or country?

MR. PASZAMANT:  I don't believe that that's particularly relevant at all for this particular case, Your Honor.

THE COURT:  So if you're precluded from inquiring as to the country and you're precluded from inquiring as to the

role and names of foreign participants, that would not adversely affect the defense in this case?

MR. PASZAMANT:  Other than in potentially the way that I articulated a moment ago, no, sir, it would not.

THE COURT:  All right.

MR. PASZAMANT:  And there are many other things that fall within that same basket.  And those are the things that are identified in that supplemental -- or final, I guess we called it -- Rule 37.1 statement, so as to essentially advise the Court and confirm with the government that we really don't feel that we need to argue over things that we don't care about.  And we set forth what those things were in that statement, of which I believe there's 13.  And one of them is the names of covert personnel.

The defendants don't care about the names of covert personnel, with two exceptions:  Ms. Haspel and Mr. Cotsana.  And the reason that they care about those two individuals is because unlike Mr. José Rodriguez, who was the director of the CIA's Clandestine Service, and Mr. John Rizzo, who was the general counsel of the CIA, these two individuals, whether it be Ms. Haspel or Mr. Cotsana, were much closer to the defendants than these other individuals who sat at the top of the pyramid, Your Honor.

And with regard to Ms. Haspel personally, she, by virtue of press releases, and in particular a February 2017 -- excuse

me, articles from the *New York Times* --

THE COURT:  I want --

MR. PASZAMANT:  I'm sorry.

THE COURT:  I want to stay with the two lawyers, Rizzo and Rodriguez.

Didn't they, in their declarations or in their depositions, disclose exactly what we've just been talking about?  That being where, who, what was said during interrogations.

And, of course, in each instance the emphasis is on the fact that the two defendants, the two doctors, didn't do anything here unless we told them to.

MR. PASZAMANT:  Your Honor, just for clarity purposes, to make sure we're on the same page.

THE COURT:  Yes.

MR. PASZAMANT:  I do believe that Mr. Rodriguez went to law school; but in this particular instance, he served as the Director of Clandestine Service for the CIA.  So he wasn't functioning in a legal capacity.  While John Rizzo was, in fact, the general counsel of the CIA.

THE COURT:  But didn't they make disclosure of what we just have been talking about?

MR. PASZAMANT:  They made disclosure not with regard to specific countries and locations of black sites and covert personnel and the various things that I'm suggesting to you the

defendants don't care about.

What they made disclosure about was my clients' lack of involvement with regard to Plaintiffs Ben Soud and Salim.  They made disclosure about essentially who was driving the bus by way of --

THE COURT:  Well, I read that.  It was very exculpatory.

If they weren't acting in legal capacities when they prepared their declarations, obviously they had assistance of counsel in the preparation of the declaration.  Because it's sort of a --

My impression as I was reading their declaration -- I read one; and I wasn't surprised what was in the second because it was a disclaimer of any legal activity and responsibility by the two doctors.

MR. PASZAMANT:  They were --

THE COURT:  And, of course, those were submitted by Mr. Warden and the Department of Justice.  The Executive Branch of the United States Government that is in the unique position in this case, as we've often discussed, of being the party monetarily responsible at the end of the day for any judgment that might be entered against the defendants.  Not as a judgment against the United States, but pursuant to the United States' agreement with the two doctors.

Here we have these two parties, you and the Executive

MOTION TO COMPEL                                                29

Branch, the Department of Justice, with a common monetary

interest; that being efforts to preclude recovery by the

plaintiffs.  And, of course, the large number of documents

submitted in connection with these pretrial disputes.

I might say that in my experience, both as a lawyer -- and

I did a lot of plaintiff and defense personal injury work --

and now as I start my 38th year here, having dealt with

innumerable -- not only in this district, but throughout the

country where I've been sitting -- other cases, I do not recall

another case, civil personal injury and wrongful death case,

where there were the number of pretrial discovery motions as in

this case.  I'm not sure how many documents have been filed so

far -- and we haven't even got to the pretrial conference stage

-- but it's a large number.

Maybe in your experience, Mr. Paszamant, you've been in a

personal injury or wrongful death case where there's been this

much pretrial activity just in the discovery phase.

Go ahead.

MR. PASZAMANT:  So, Your Honor, as we've tried to

articulate -- *we* being the defendants -- in our various

motions, we have felt from the outset that in order to properly

defend ourselves we needed information from the government.

We weren't comfortable with simply looking to the SSCI

report and some of the other documents that have been

disclosed, where the plaintiffs initially were saying that's

all that was really needed.

THE COURT: But I assume --

Here I am complaining about all this time we're spending on discovery and now telling you what I think would take place at trial. But my hypothetical is at trial the defendant doctors would get on the stand and testify along the lines of what's in the Rizzo and Rodriguez declarations; that being they only did whatever they did at the direction of the government.

Then your next witnesses would be Rodriguez and Rizzo, saying: Yes, that's the case, they only did what they did because we told them to.

Now, why isn't --

Now you then want more government witnesses, Haspel and Cotsana, to be the third layer of the defense; that being: Yes, they only did what we told them to do.

MR. PASZAMANT: Your Honor, if I may.

THE COURT: Sure.

MR. PASZAMANT: So with regard to Ms. Haspel in particular, the media reports are that she was the Chief of Base for Black Site Green, I believe it was, where Abu Zubaydah was interrogated.

In fact, in that same *New York Times* article, which we appended to the Querns declaration, which was part of our opposition filing, it's identified that she personally oversaw Abu Zubaydah's interrogation.

MOTION TO COMPEL

So why is that important?  Well, it's important, Your Honor, because the core of the plaintiffs' case here is that what was perhaps in the first instance devised for Abu Zubaydah was extrapolated over to the plaintiffs.

Irrespective of whether my clients had any direct involvement with that; frankly, irrespective of whether my clients ever could have even known that what they prepared for Abu Zubaydah and then subsequently understood was to be used on other high-value detainees; irrespective of whether they could have known that those very same things would be used on others, medium-value detainees, low-value detainees.

THE COURT:  But Rizzo and Rodriguez would testify to the exact same thing.

MR. PASZAMANT:  They can speak at a high level, Your Honor.

When we're speaking of Ms. Haspel and Mr. Cotsana, we're talking, with regard to Cotsana, about the defendants' direct supervisor.  Which is exactly what we had told Your Honor back in September, which brought about the order of October 4 where you said:  You're entitled to depose this man, but let's do an interim step.  Let's provide questions and see what the government says.  And we did that.

So, Your Honor, it's almost like we got to get a declaration from and a deposition with the CEO and the general counsel of a large company.  What we're talking about now with

MOTION TO COMPEL                                                    32

regard to Cotsana is if my guys were line employees -- and I

recognize they were independent contractors -- we're talking

about one level up, Mr. Cotsana, their direct report.

     If anybody can testify as to what these gentlemen did day

in and day out, it's him.

          THE COURT:  But they --

          MR. PASZAMANT:  And it corroborates, Your Honor.

          THE COURT:  I'm sorry.

     Can't and wouldn't your clients so testify?

          MR. PASZAMANT:  They would, Your Honor, but --

          THE COURT:  And from what you've --

          MR. PASZAMANT:  I apologize.

          THE COURT:  -- heard so far from the Executive Branch

of Government, would they be precluded in any manner from

testifying as to who their direct supervisor was and their

interaction with their direct supervisor?

          MR. PASZAMANT:  I believe they would, Your Honor.

Because to the extent that --

          THE COURT:  I haven't seen any filing to that extent.

But once again, that's maybe down the line.

          MR. PASZAMANT:  My understanding, Your Honor, is to

the extent that what we're talking about is a specific name and

an individual who fit within the rubric of the CIA's structure,

including James Cotsana, the government's position is and has

been:  If that individual remains as having never been

acknowledged to be part of the program, it's off limits to you now, defendants, to speak of it.

And that's exactly the reason that's being proffered for why it is we shouldn't get Cotsana or Haspel's depositions. The reason being proffered, Your Honor, by the government is simply they've never been identified as having been associated with the RDI program; and, therefore, you shouldn't be able to take their deps now.

THE COURT: So if the government would preclude your clients from testifying about their role with Haspel and Cotsana because of state secrets and Pompeo's declaration, then how can you suggest that the State Secrets Privilege does not apply to Haspel and Cotsana?

MR. PASZAMANT: Well, because, Your Honor, our position is that it shouldn't apply --

THE COURT: Why?

MR. PASZAMANT: -- to Haspel and Cotsana.

With regard to Ms. Haspel --

THE COURT: What could be more of a state secret than who was involved in interrogation of foreign military or terrorists, whatever you want to call them, by CIA agents?

What could be of greater secrecy than that?

MR. PASZAMANT: So, Your Honor, as I know you've seen by virtue of all the cases that you've read, including the *Mohamed* case, as well as *Al-Haramain* -- if I'm pronouncing it

correctly.

THE COURT:  A Fourth Circuit case?

MR. PASZAMANT:  No, it's a Ninth Circuit case, Your Honor.

THE COURT:  Which one did you say?

MR. PASZAMANT:  Islamic Foundation.

THE COURT:  All right.

MR. PASZAMANT:  It's got a lengthy name and I've butchered the first name.

But the Court is entrusted when assessing a state secret -- and it is entrusted with assessing whether it could be a state secret.  The first question is:  Is it a secret?

And if Ms. Haspel has been publicly acknowledged by the CIA formally as having been involved in this program, Your Honor, it doesn't pass the smell test that the mere identity of her name at this point in time could remain a state secret.

THE COURT:  Is it your position that that waives the State Secrets Privilege as to what her testimony would be?

MR. PASZAMANT:  I say yes, Your Honor.  Certainly with regard to the fact that she was involved.

And we haven't even gotten to the next step, which is:  Okay, now we know she was involved.  And Your Honor said that she can be deposed, perhaps.  But what can she really say?

It seems to me what she can say and what we're really looking for is what did Mitchell and Jessen do.  What did they

MOTION TO COMPEL

do?  And she would have been privy to internal discussions as to what they could do, what they should do, and what their involvement in the program was or was not; which is everything that lies in the heart of this particular matter.

So, Your Honor, with regard to Ms. Haspel --

THE COURT:  Well, while you're there --

MR. PASZAMANT:  Yes, sir.

THE COURT:  -- if there are specific documents in the list of 47 that are tied to this discussion that we're having about Haspel and Cotsana, I'm prepared to look at those documents at this time.

MR. PASZAMANT:  Your Honor, I can't direct you to this document or another document relating to Haspel and Cotsana because their names haven't been disclosed in the only information that I have, which are those unclassified summaries; which have, in many instances, the same lead in:  We withheld the names and the foreign and so on.

THE COURT:  Well, when I hear from Mr. Warden --

Mr. Warden, I want you to tell me what documents are being treated as classified that contain reference to Haspel and Cotsana so that I can look at those specifically.

They're here.  Mr. Slade is here with the documents, and I'm prepared to look at them.

MR. PASZAMANT:  Thank you, Your Honor.

And just so we don't perhaps inadvertently overlook

something, it's more than, in the defendants' eyes, whether Ms. Haspel or Mr. Cotsana is identified by name in a document. It could very well be -- and I can't give you any more specificity because of the way these things are redacted -- that they might be part of something that falls within an e-mail interrogation team, I don't know, or Alec Station. Quite possible.

THE COURT: If the plaintiffs in their testimony identify those two persons, Haspel and Cotsana --

MR. PASZAMANT: Yes, sir.

THE COURT: -- what would your position then be?

MR. PASZAMANT: I would --

THE COURT: The Executive Branch of the United States Government cannot preclude the plaintiffs from testifying to --

This is not a final ruling, but my impression is the Executive Branch cannot preclude the plaintiffs in this case from testifying fully as to who they dealt with and what took place.

MR. PASZAMANT: I suspect that you are correct in that assessment, Your Honor.

And then with regard to the question which I understand you to be asking, which is: If that were to occur, would my clients be able to respond? Has the door been opened, or something akin to that.

Your Honor, it's an interesting question, but I believe

the answer to that question would be that my clients, unlike

the plaintiffs, are bound by nondisclosure agreements.

My clients, unlike the plaintiffs, have been provided this

*Classification Guidance*.  And, therefore, unless and until the

Executive Branch of the Government -- the CIA, in particular --

says that my clients can speak to those issues, they need to

remain mum unless Your Honor allows it.

THE COURT:  Maybe the Executive Branch of the United

States Government in this case, holding the purse -- our

pursestrings, we the taxpayers' pursestrings, will have to make

a decision as to what's more important, the testimony that

would support the defense or the protection of the State

Secrets Privilege.

MR. PASZAMANT:  Your Honor, I suspect that is a

calculus that the government will have to employ.  But

respectfully, I have no insight into that.  And even if that

were to occur, if the calculus that the government came down

with was we don't much care about how much money this could

pertain to, we still want it kept secret, you could imagine

that that could greatly prejudice my clients because they are

hampered in terms of their ability to speak to some of these

issues, as well as their ability to rebut these issues.

And the same would hold true, by the way, not only from my

clients, but with regard to José Rodriguez and John Rizzo.

Because the application has been consistent, as I understand

it.

So that's an issue, Your Honor, for sure.  But I don't believe that the government has the ability to muzzle the plaintiffs in terms of maybe anything that they want to say.

So just moving along, Your Honor.

THE COURT:  Maybe I can assist you by --

I think I've exhausted most of my questions.  Go ahead.

MR. PASZAMANT:  Okay.  Well, Your Honor, I'm, of course, happy to answer any others that you have as I proceed.

But, Your Honor, you can imagine the difficult situation that the defendants have found themselves in, from the first privilege log that we received in December to the first cut of unclassified summaries to subsequent unclassified summaries and amended unclassified summaries.

Each step of the way, Your Honor, to a point -- and I'm not trying to pass along any sort of concept of ill motive, but the defendants are being put in a position of having to read the tea leaves.

What does this document really say?  Does it really say what the defendants -- or excuse me, the government is contending it says by way of its classified summary?  Does it perhaps say something else?

So we've tried in good faith, Your Honor -- for lots of different reasons, not the least of which is that the Court asked us to do it -- to cull the amount of documents we're

MOTION TO COMPEL

looking for.  But we've done it, we think, to a point where we really can't do it any further and remain vigilant to our clients' position.  And that's how we end up with the 47.

THE COURT:  And I want to get to that point, if I could interrupt any presentation by the defense.

I want to hear from Mr. Warden as to what of the 47 documents he contends directly relates to the testimony of Haspel and Cotsana, because I intend to look at those.

MR. PASZAMANT:  Your Honor, of course.  I understand. And I'll truncate any presentation with regard to state secrets because I think we've largely covered it.  You just need to determine whether, in fact, you believe it was properly invoked with regard to all the subject matters for which it purports to have been invoked and whether, in fact, it's a secret.  That's really what it comes down to.

And respectfully, Judge, you've said to us on a couple of occasions that there's an awful lot out there.  The SSCI report.  The Inspector General stuff.  There's Armed Services Committee, things like that.

I would ask, Your Honor, that you simply think hard about whether some of the things for which the director has claimed a secret are, in fact, a secret.

And the second part of that prong, by virtue of the U.S. Supreme Court decision in *Reynolds,* is:  Will this, if disclosed, potentially lead to a problem with national

MOTION TO COMPEL                                              40

security?  That's the back end of the prong.

THE COURT:  But I don't think *Reynolds* requires me to make a conclusion as to whether or not -- or what the consequence would be of disclosure.

MR. PASZAMANT:  I believe that's correct, Your Honor, and has determined that that's best left to the head of the agency who has taken the declaration.

Having said that, I do believe that under *Reynolds* and the Ninth Circuit law you have an obligation to look at the documents for which the State Secrets Privilege has been advanced with a skeptical eye; to see whether, in fact, the privilege has been invoked too broadly.  And part and parcel of that is does it make sense when they say that if you were to disclose this, it could lead to a national security problem.

Your Honor, we're talking about a program -- or, excuse me, circumstances that occurred 15 years ago.  We're talking about a program that hasn't been in play for an awful long time.  In fact, we're talking about a program -- for the EITs anyway, those are now outlawed by virtue of the law in 2015.

So respectfully, as I know you will, I would simply ask when you're looking through the documents to consider whether, in fact, these things are secret.

Before I move off state secrets entirely, Your Honor, in each of these instances, as best I can tell, the State Secrets Privilege has been advanced in conjunction with the CIA Act and

the NSA act.  They seem to rise and fall together in terms of what the government has done here.

Just to touch on each relatively briefly.  The NSA act is extremely limited.  It precludes disclosure only of interrogation -- excuse me, intelligence sources and methods.  Nothing more and nothing else.

With regard to the CIA Act, that speaks to precluding information solely with regard to the internal structure of the CIA, as well as personnel functions.  It's not a broad privilege, Your Honor.

THE COURT:  I think it is a broad privilege.  The CIA Act.  It speaks for itself.

MR. PASZAMANT:  I believe it speaks for itself, Your Honor.  But courts interpreting it, primarily those coming out of the D.C. Circuit, talk about what the word *function* is intended to mean in conjunction with the CIA Act.  And those cases, Your Honor, speak to the fact that *function* is not to be interpreted to subsume anything the CIA does.  It is the function of personnel and nothing but the function of personnel with regard to the CIA Act.

And in particular, Your Honor, I'll just -- the case that I'm primarily speaking of with regard to the CIA Act, as I flip pages here, is --

There's *National Security Counselors* out of the District of D.C.  That's a District Court case, but it's speaking to

prior D.C. Circuit Court cases.  As well as the *Whitaker vs. CIA* case.  Those cases both, by quoting and otherwise citing to the D.C. Circuit, espouse just how limited the CIA Act is.

THE COURT:  Well, but, of course, the Ninth Circuit has spoken to the CIA Act.  The Ninth Circuit, that I have indicated has taken a conservative approach to the application of the State Secrets Privilege.

For example, in that *Minier vs. CIA* case -- while it was some time ago to some of you, in 1996 -- the Court stated the statute provides, quote, broad authority.  And the statutory mandate is only a short step from exempting all CIA records from Freedom of Information requests.

The Court held that the CIA statute authorizes the CIA's refusal to confirm or deny the existence of an employment relationship between itself and an alleged agent.

That's a pretty conservative interpretation of the CIA Act, but that's what the Ninth Circuit has said.

MR. PASZAMANT:  I understand, Your Honor.  And I, too, read that case.

If you think about it, though, what that speaks to is the ability to confirm or deny an individual's name.  That's personnel, Your Honor.  That's what we're talking about with regard to that case.

I recognize --

THE COURT:  Isn't that what we're talking about with

MOTION TO COMPEL

regard to Haspel and Cotsana?

MR. PASZAMANT:  Yes, unless Ms. Haspel has already been disclosed both formally and informally.

And on the informal prong, the government rolls out to you in its briefing different perceived harms that could be bestowed upon the CIA in the event that these individuals' names are actually able to be publically disclosed and depositions taken:

One, recruitment problems; two, jeopardizing these people's lives; three, intelligence sources might be compromised.

Your Honor --

THE COURT:  Or jeopardizing people who are, in fact, operating as CIA agents.

MR. PASZAMANT:  No question.  But I'm not asking, and the defendants aren't asking, for the disclosure of anybody else's names besides defendants, Ms. Haspel, and Mr. Cotsana. Nobody beyond that, Your Honor.

And in this particular instance I respectfully suggest to the extent that there was a disclosure that perhaps caused some jeopardy to either of these individuals, that was when it hit the media and talked about all the things that Ms. Haspel --

THE COURT:  But that's not a CIA disclosure or waiver.

MR. PASZAMANT:  Well, with Ms. Haspel you have the

MOTION TO COMPEL

44

press release that we identified, which identified her as the Chief of Staff or the Director of Clandestine Service.

We also have Mr. Rodriguez's book where he talked about his valued chief of staff. He called her Jane. But this is a terribly kept secret, Your Honor, by virtue of simply those things that the CIA has allowed to be disclosed.

And, respectfully, it just -- it's trying to fit a square peg into a round hole after the fact. Certainly with regard to Ms. Haspel.

With regard to Mr. Cotsana. As we identified in the paperwork that we filed, this is a gentleman -- you know, God bless him, he's talking to groups of former intelligence officers up in Maine about his role in the CIA's RDI program.

So it may be that the CIA didn't say, Oh, yes, he was part of the program. He's saying it. And presumably they're allowing him to say it. Because the way it works in this world is if you used to work for the CIA, you don't just get to talk. You have to run things by them. Just as Jim Mitchell had to run things by and get approval for his book. Just as José Rodriguez had to run things by the CIA and get approval for every word in that book, Your Honor. A hundred and sixty-some-odd some pages of that.

With regard to your skeptical eye, Your Honor -- and we identified this in our briefing, but the government is only human in terms of those who have reviewed these documents, the

MOTION TO COMPEL

unclassified summaries and the like.  We've identified for you instances where the government had to concede that, in fact, it was identifying under the State Secrets Privilege certain things that were specifically in the SSCI report, which are allowed to be disclosed.

In another instance they say, Well, we recognize this document is cited in the SSCI report.  But in case in point, what the document says and what's in the SSCI report are two different things.

Well, Your Honor, that's critically important for the defendants.  We shouldn't have to take the government's word for it.  And to the extent that the SSCI report is in error --

THE COURT:  Or the defendants' word for it.  Isn't that your position?

MR. PASZAMANT:  I'm sorry.  I don't follow the question, Your Honor.

THE COURT:  Well, I have in mind throughout all this that the defendants are certainly free to testify to exactly what you have stated here.

Although the restrictions are not before me, you indicate the Executive Branch of the United States Government has already indicated they're going to interfere in some manner with the two doctors' testimony in defense of these claims.

I haven't seen that and that's not yet before me.  If this goes on and on and on, I assume one day we'll be here talking

about that aspect of the case.

MR. PASZAMANT:  I agree with the initial premise of your question, Your Honor, which is, you know, will the defendants be able to testify.  Yes.  But the question is: Testify with regard to what?

So the document in particular that I'm talking about where the government is saying this document doesn't say -- this document that we've redacted, and you don't have the information, doesn't say what's attributed to it in the SSCI report.

Well, assuming my clients knew what was in that document, it stands to reason that they, too, would not be able to testify as to what's in that document because the government is taking the position that it's thou shalt not.

THE COURT:  I understand.

I want to hear from Mr. Warden on these questions.  I've given you now about 45 minutes.

MR. PASZAMANT:  May I speak, Your Honor, simply to the Deliberative Process Privilege?  Because I don't think that we have covered that just yet.  And it's important, in our eyes, Your Honor, because for certain documents it's only the Deliberative Process Privilege that is being advanced or it's only the Deliberative Process Privilege that is something that we are contesting.  In other words, the defendants have given up any challenge to the state secrets assertion, the NSA act,

MOTION TO COMPEL

or the CIA Act.

With regard to the Deliberative Process Privilege, Your Honor, as set forth in our briefing, as I'm sure you've read in the cases, that's different, much different than the State Secrets Privilege.

There is an assessment that needs to be made. Is it predecisional? Answer: Yes or no. And if it's no, you don't get to prong two, which is: Is it deliberative?

Predecisional meaning did it happen, was it authored prior to a decision, in most instances.

Deliberative: Did it influence the decisionmaker ultimately, such that to disclose it now would disclose some aspect of the decision ultimately made so as to hamper decisions going forward?

Instructions from superiors to subordinates, they are not deliberative. Those are instructions. So when CIA headquarters says it's giving guidance to the field or authorization to the field, that's not deliberative. That's an instruction. To the extent something is only factual, that's not deliberative.

So, Your Honor, there are a host of documents identified in our briefing, as well as within this particular matrix, which I now understand you have expanded, that we believe are not susceptible to the Deliberative Process Privilege. In many instances it's simply because so much has already been

disclosed about Zubaydah's interrogation, the EIT program, its origins, so on and so forth.  If it's already disclosed, then you cannot maintain the Deliberative Process Privilege.

THE COURT:  Disclosed by who?

MR. PASZAMANT:  Allowed for disclosure by the CIA.

THE COURT:  Oh.

MR. PASZAMANT:  So to the extent, for example, some of this was disclosed because the CIA allowed it to be disclosed in the SSCI report.  To the extent they now want to say no, this particular document, which relates to the very same subject matter, is deliberative process and therefore protected, it doesn't work, Your Honor.

And in addition to that, even if you determine that it fits both predecisional and deliberative, there is an override, Your Honor.  If the document --

THE COURT:  I've read your briefing on that and the attorney/client claim.

MR. PASZAMANT:  Very good, Your Honor.

THE COURT:  We'll take a five minute recess.

MR. PASZAMANT:  Thank you, Your Honor.

LAW CLERK:  All rise.

Court is in recess for five minutes.

(Recess was taken at 10:16 a.m.)

LAW CLERK:  All rise.

Court is reconvened.

THE COURT: All right. Just be seated.

Mr. Warden, I want you to identify for me from this Document 88-1, that I can --

Maybe if you have a copy. You don't have an enhanced copy.

MR. WARDEN: Your Honor, I can answer your question here.

THE COURT: Okay.

MR. WARDEN: Which is --

THE COURT: Well, let me tell you what my question is first.

MR. WARDEN: Sure.

THE COURT: I want you to identify for me any document that has been withheld or any document that has been redacted by reason of the Haspel and Cotsana matter.

Can you --

MR. WARDEN: Your Honor, I cannot do that here in open court today.

I cannot confirm nor deny whether Gina Haspel nor James Cotsana were involved in the CIA's formal --

THE COURT: I'm not asking you to. I'm just asking you to identify --

MR. WARDEN: To identify --

THE COURT: -- the documents that you've withheld.

MR. WARDEN: To the extent their names are mentioned

MOTION TO COMPEL                                               50

in the documents -- and I'm not confirming or denying that they

are here in open court -- it would itself disclose whether they

were involved in the program.

We can give you that answer in a classified *ex parte*

setting, but I cannot do that here in open court.

THE COURT:  Well, I'm directing you to tell me from

this list what, if any, of the listed matters would be withheld

in whole or in part by reason of Haspel and Cotsana.  Because

that's the most important part of this morning's proceeding, I

believe.

MR. WARDEN:  Your Honor, we can provide you with an

answer to that in an *ex parte* in camera proceeding.  But I

cannot do that here because to do so --

THE COURT:  Well, sit down and write out the numbers.

MR. WARDEN:  Your Honor, I cannot do that here in an

*ex parte* -- in a public proceeding.

THE COURT:  I'm running this court, not you,

Mr. Warden.

MR. WARDEN:  I understand.

THE COURT:  I want you to sit down at your table and

write out the numbers, that you can hand to the Court.  And I

will then look at the documents.  I intend to inspect the

documents.

Do you understand my order and direction?

MR. WARDEN:  I do, Your Honor.  I just cannot answer

your question without prejudicing our entire position here.

We can step into the hallway and I can --

THE COURT:  It's not prejudicing anything.  It's a submittal to the Court, and no one else, as to the documents that may refer to Haspel and Cotsana.

MR. WARDEN:  Your Honor, without having the ability to review the unredacted versions of the documents, I'm unable to do that.

THE COURT:  Don't you have those documents?

MR. WARDEN:  We do.  Mr. Slade has them.  There are several thousand pages.

To answer your question I would have to go through those documents and then provide you with an answer.  And the answer that I would provide you --

THE COURT:  You don't know what documents you're withholding by reason of Haspel and Cotsana's involvement?

MR. WARDEN:  As I stand here right now I'm not either confirming or denying whether any documents have that, but I could not give you that answer without reviewing the documents to make sure I give you an accurate answer.

We have withheld many documents on the basis of the fact that it includes names of CIA officers.  But to give you the answer to your question, to make sure it's accurate we would have to go through the documents and provide you with that information.

THE COURT:  Well, the ones that you know about, I want you to write down on a piece of paper so that I can look at them now.  I'm not going to send you all home and tell you to come back Monday morning.

MR. WARDEN:  I'm happy --

Your Honor, I can't give you that answer.  I don't have the information in front of me.

I'm sorry.  I just do not have that information.

THE COURT:  And you need to look at the documents that Mr. Slade has?

MR. WARDEN:  It would be, to some extent, more complicated than that.  And we can explain why that is in a classified setting.  But I could not answer your question on the public record without review of the documents.

THE COURT:  I'm not asking for a public recitation. I'm giving you the option of sitting down at counsel table, writing out on a piece of paper the documents that are a matter of public record and which ones refer in any manner to Haspel and Cotsana.

MR. WARDEN:  I would have to review all of the documents to give you an accurate answer.

THE COURT:  And how long do you expect that to take you?

MR. WARDEN:  I believe there's several thousand pages of documents.

THE COURT: Well, you are the one that's withheld the documents, Mr. Warden.

MR. WARDEN: Absolutely, Your Honor.

We haven't categorized the documents in that way. I want to make sure I would give you an accurate answer so you could --

THE COURT: I'm not asking you for a complete list. I want to look at some of the documents that are withheld because of Haspel and Cotsana.

MR. WARDEN: Your Honor, then I would ask that we have a brief recess of 10 minutes. I can flip through the documents as quickly as I can.

Again, I'm not confirming or denying whether their names are mentioned there, but I could at least give you some accuracy of the answer.

THE COURT: All I'm asking you to do is write down on a piece of paper or --

And if you feel more comfortable, then, Mr. Warden, *ex parte* reading from that piece of paper in closed court, as to those numbers, I will allow you to do that.

MR. WARDEN: Your Honor, I don't know --

As I stand here today, I don't know the answer to your question.

THE COURT: Well, you are the representative of the Executive Branch of the United States Government that's

withholding these documents under a claim of privilege.

MR. WARDEN:  To be sure.

THE COURT:  I want to know what claim of privilege relates to Haspel and Cotsana.

MR. WARDEN:  We can provide you with that information once we have an opportunity to go through the documents.

We didn't --

THE COURT:  All right.

MR. WARDEN:  We didn't have an opportunity to consider that.

THE COURT:  I'll give you 10 minutes.  And we'll all sit here and wait for you.

Which documents do you want Mr. Slade --

MR. WARDEN:  We would need to look at the entire batch.  And we'll write down on a piece of paper, to the extent we can, whether there's an answer to your question.

THE COURT:  All right.

(Pause in proceedings.)

THE COURT:  And while you're doing that, I'm going to give --

Go ahead.

MR. WARDEN:  Well, we need to do this in a secure area.

MR. SLADE:  We have to do that outside the public.

THE COURT:  He can sit right there.  You can sit with

him at counsel table.

And while you're doing that, I'll hear from the plaintiffs as to anything they wish to say as to what's happened so far today.

MR. LADIN:  Thank you, Your Honor.  This is, again, Dror Ladin for the plaintiffs.

I think Your Honor is asking exactly the right questions when you ask defendants what additional information is added to their defense were they to depose this extra layer of CIA personnel that they claim has knowledge of what they were and were not authorized to do.

And there's two main reasons why that is entirely unnecessary to this case.  The first, as you've identified, is that the person who defendants claim was the boss of the two people they seek to depose has already provided sworn testimony, both in a declaration and in his deposition, saying, as you said, as if it were crafted by an attorney, that everything that the defendants did in the CIA program was authorized by a layer of review.  And this would be the layer that was above the two people that the defendants seek to depose.

So having been given this blanket testimony about authorization, as Your Honor pointed out, nothing additional is added to their defense by getting also an intermediate level of authorization.

MOTION TO COMPEL                                                    56

The second thing, of course, Your Honor, is, as we've said since June of last year, it's not a matter of controversy in this case whether there were authorizations for defendants' actions.  But the other side of that is that it's never been a defense in a war crimes or a torture case to say, I was following instructions.

Of course, here we're not just talking about following instructions.  We're talking about designing a torture program that was then applied to a variety of CIA prisoners, including the plaintiffs here.

But in any event, it is simply legally unprecedented for a person to claim that if only they can establish another link in the chain of instructions, they will have exculpated themselves for a claim of torture or war crimes.

The second thing is that the defendants also say, and they've said a number of times today, that they had no personal involvement with plaintiffs.  And, again, Your Honor, this raises the same question you've raised in the past about what is the purpose of the defendants' discovery.  They have conclusive admissions from the plaintiffs, that were attached to our declaration in this case, in which the surviving plaintiffs say, Neither defendant was personally involved in my torture.

This case has never been about that.  This case has always been, from day one, about defendants' design of the program,

MOTION TO COMPEL                                                    57

their testing of that program on Abu Zubaydah, and then those techniques being used on our clients.  And none of the --

THE COURT:  Tell me what the defendants said.  I assume you've deposed them.

MR. LADIN:  Yes, Your Honor.

THE COURT:  Tell me what they said in their depositions.

MR. LADIN:  Well, Your Honor, Defendant Jessen testified for hours about a variety of things, including at great length about his role in the interrogations of Mr. Rahman, who is deceased.  So there was certainly no restriction placed on his testimony to talk about his role there.

Both of the defendants testified repeatedly that they understood everything they did to be authorized.

And Defendant Mitchell testified, as did Defendant Jessen, about the origins of the program; about how they had meetings with Mr. Rodriguez about what the techniques were that the defendants were recommending; about how those techniques were then authorized; and about how the defendants then employed those techniques on Abu Zubaydah.

An important thing to recognize about where this case has gone and how much has happened since September is that you would be forgiven from defendants' testimony for thinking that the only thing this case has at the moment is the public record

as it existed last summer.  Since that time we've received thousands of pages, documenting in great detail everything defendants proposed to do to Abu Zubaydah, everything defendants inflicted on Abu Zubaydah, defendants' assessment and other people's assessment of the success or failure of torturing Abu Zubaydah in that way.

THE COURT:  I sense that in the plaintiffs' case in chief you propose to spend a substantial amount of time on the Zubaydah matter.

MR. LADIN:  Your Honor, I don't think we need to spend a substantial amount of time on it in our case.  In our case, the causation is fairly simple.

You know, as we've always said, what defendants did is they devised a program for the CIA.  Abu Zubaydah was their first subject.  And then they continued to work on this program for I think six more years, at which time many people were subjected to this.

And throughout that time, defendants eventually became the sole-source contractor.  The contractor was paid $81 million in taxpayer money for this.

The trial will not be about every person defendants personally tortured.  And it won't be focused, you know, for a week on Abu Zubaydah.

Abu Zubaydah represents, as the discovery rulings in this case have said, the design moment of the program.  After that,

our clients would testify about how precisely the program that defendants designed was applied to them.

And, you know, defendants will have the opportunity to say, if this -- if the Court rules that this testimony is relevant, that they did not personally know our clients or personally intend that their program -- which they intended, according to them, only for other prisoners -- would also be applied to our clients. So that testimony would be there.

But the focus would not be on Abu Zubaydah, Your Honor. He's only the design moment.

THE COURT: It's my understanding that the plaintiffs would not --

Maybe I should not tell you what my understanding is. I should propound a question to you. Would the plaintiffs --

And I want -- because Mr. Warden is busy picking out the Haspel and Cotsana documents. Would the plaintiffs identify personally Ms. Haspel or Mr. Cotsana?

MR. LADIN: Thank you for asking that, Your Honor. And that's such an important question, because you should also ask defendants about this.

Defendants don't allege that either Ms. Haspel or Mr. Cotsana has any personal knowledge of plaintiffs, much less actually encountered plaintiffs.

So there's no allegation from defendants' side that Ms. Haspel or Mr. Cotsana could say: Well, Mr. Ben Soud was

MOTION TO COMPEL    60

subjected to defendants' techniques, but X, or but Y, because I was there and I saw it.

Plaintiffs have certainly -- plaintiffs have all given testimony. They've certainly not ever identified or suggested that Mr. Cotsana or Ms. Haspel is a name they've ever heard or know anything about. And the defendants have not suggested that the testimony they seek would relate to the plaintiffs.

THE COURT: All right.

MR. LADIN: They just want another layer of authorization.

THE COURT: Thank you.

MR. LADIN: Thank you, Your Honor.

MR. PASZAMANT: Your Honor, may I be heard on --

MR. LADIN: Sorry. Do you have another question, Your Honor?

THE COURT: I'm sure I do, but I'm not prepared to propound it now.

MR. LADIN: Thank you very much, Your Honor.

THE COURT: Thank you.

MR. PASZAMANT: May I be heard on the discrete issues that --

THE COURT: No. Later.

MR. PASZAMANT: Thank you, Your Honor.

THE COURT: Maybe Monday, if we're all going to be back here Monday.

Next week I had a personal injury serious claim that, like all good cases, was resolved a few days before trial.  So I have next week to spend on this case, if necessary.

MR. WARDEN:  Your Honor, again, Andrew Warden for the government.  I'll hand up --

Based on the limited amount of time we've had, this is the answer to your question.

THE COURT:  I'm available for you to stay here.

MR. WARDEN:  We will provide you with an answer to your question.  We will do that as expeditiously as possible.

THE COURT:  All right.

MR. WARDEN:  We will stay here after the hearing and review the documents.

THE COURT:  So you've been unable to at this time identify any documents that specifically refer to Haspel and Cotsana?

MR. WARDEN:  Based on our review, we have not.  That does not confirm nor deny whether there are or there aren't, but in the limited time we have.  But we will review the documents.

Again, I would ask -- we can explain more to you and give you a more fulsome answer in an *ex parte* hearing, to try to explain the situation here.  And we would ask the Court to let us be heard on that so that we can give you an accurate answer.

THE COURT:  I've given you the opportunity to

identify any documents you've withheld by reason of reference to Haspel and Cotsana.

MR. WARDEN: Sure. I would --

THE COURT: If you would just let me finish, Mr. Warden, it may be helpful to you.

Are you prepared to listen?

MR. WARDEN: Yes.

THE COURT: My impression is, without finally ruling, that Ms. Haspel and Mr. Cotsana, in view of their roles with the CIA --

Just by reason of that fact I would -- and because of their apparent, so far, lack of identification of association with the plaintiffs. I am under the impression -- and I often use the word *impression* so counsel will know it's not a final ruling -- that they, by reason of their employment past and present with the CIA, should not be identified.

The plaintiffs -- Mr. Ladin just got through telling me that they don't intend to mention Ms. Haspel's or Mr. Cotsana's name in their -- at least their direct testimony. So this may be much ado about nothing, other than what counsel for the defense are saying, that he believes that they were directly involved with the defendants.

But as I have indicated earlier this morning, it seems to me that that's somewhat collateral to their direct testimony that whatever they did was done at the direction of CIA

officers or agents.  So I'm going to give counsel --

So far, no documents have been identified as being withheld based upon Haspel and Cotsana.  Let me ask you about other documents.

MR. WARDEN:  Your Honor, if I may, at least speaking to the documents.

THE COURT:  Go ahead.

MR. WARDEN:  We prepared a chart in advance of this hearing, that's maybe a little bit more legible and breaks those documents into several categories, that we think might assist the Court in its adjudication of these issues and hopefully lead to some efficiencies.  If I may.

THE COURT:  Go ahead.

MR. WARDEN:  We passed this chart to the parties in advance of this.  And I'm happy to pass a copy to Your Honor so you don't have to read it on the screen, if you like.

(Document handed to the Court.)

MR. WARDEN:  This, I think, sets a framework for how the government has approached the document dispute in this case.

So, as you see at the top, there are 48 disputed documents.  We're now to 47 by virtue -- as Mr. Paszamant said, No. 37 has come off the board.

So, as we explained in our Rule 37.1 statement, there are a number of documents that the government has produced to

MOTION TO COMPEL                                                    64

defendants where we have produced the relevant information they have sought about Dr. Mitchell's and Dr. Jessen's role in the program.  And information in those documents has been redacted, but the redactions pertain to other subjects.

And so that's what Category 1 is.  That is the listing of the documents where the documents do not withhold information about Dr. Mitchell's and Dr. Jessen's role in the program. Now, there are redactions, again, to privileged information about other subjects.

So for this category, Your Honor, we don't think there's any need for Your Honor to engage in a lengthy adjudication of privilege for who knows how many number of redactions.

THE COURT:  Which --

MR. WARDEN:  Defendants still --

THE COURT:  In that Category 1 which document do you feel is most illustrative of those documents?

MR. WARDEN:  Let's see.  I would have to look at my --

One moment, Your Honor.

THE COURT:  Sure.

(Pause in proceedings.)

MR. WARDEN:  Let's take No. 39 for example, Your Honor.

No. 39 --

THE COURT:  Let me see 39, Scooter.

MOTION TO COMPEL

65

MR. WARDEN:  And I can pass a copy of No. 39 itself up to you, if you would like to see a copy.

THE COURT:  Why don't you give me your 39.

(Document handed to the Court.)

THE COURT:  Thank you.

MR. WARDEN:  So 39, Your Honor, is an investigation by the CIA's Deputy Director of Operations of the death of Gul Rahman.  And in this document, Your Honor, it describes in detail the circumstances that let to Mr. Rahman's death.  It identifies that Dr. Jessen had some contact with Gul Rahman.  His name is unredacted in the versions we've provided to the defendants.

We have also taken the extra step to give defendants as much information as possible of -- in our versions, although not the one you see -- of putting in margin substitutes to explain where we're referring to a CIA staff officer, in lieu of their actual real name.

So they have all of the information here in this document about the circumstances of Gul Rahman's death, the places where Dr. Jessen was personally involved, and the places where CIA officers are involved.

There are redactions to all sorts of other things, but it's not about Dr. Jessen or Dr. Mitchell.  So that's, we think --

THE COURT:  I want to look at 39.  And you can be

seated.

It's how many pages?  35 pages.  Just give me -- I'll take whatever time is necessary.

(Pause in proceedings.)

MR. PASZAMANT:  Your Honor, I'm sorry to interrupt.

We have a full set of the documents that remain at issue, but in redacted form.

THE COURT:  Yes.

MR. PASZAMANT:  Would that be helpful?

THE COURT:  No.  I have the full form and it shows what has been redacted.

MR. PASZAMANT:  No.  I understand.

My question simply is, Judge, would it be of any value to you to be able to compare them against one another, to see what we have versus what you now have in the unabridged version?

THE COURT:  I assume you have received what's not been redacted.

MR. PASZAMANT:  I don't know the form of what you're looking at, Your Honor.  I've never seen it.

THE COURT:  Mr. Warden will help us on that.

MR. WARDEN:  Your Honor, the version you have -- and I would maybe ask that you put it down, just so no one can read it, please.

The redactions we have made to the documents we produced to the defendants and plaintiffs are highlighted in gray on the

MOTION TO COMPEL

versions you have in front of you.  So if you see gray, that means it's been withheld from the defendants.

THE COURT:  And everything else has been furnished to the defendants.

MR. WARDEN:  Correct.

THE COURT:  All right.

(Pause in proceedings.)

THE COURT:  And so that the record is clear, I'm going to make this Court Exhibit No. 1 on today's hearing. That being the response of Mr. Warden to my inquiry as to any documents that refer to Ms. Haspel and Mr. Cotsana that have been withheld or redacted in any form.

So, Lee Ann, if you'll make that the Court's Exhibit 1 for today.

(Court's Exhibit No. 1 - admitted.)

THE COURT:  Do I understand, Mr. Warden, that anything in this Document 39 that refers to either Jessen or -- either one of the defendants, whether it be Mitchell or Jessen, has not been redacted?

MR. WARDEN:  Correct.

THE COURT:  That was my impression.  I've been through Page 1 through 22.  And I note that every reference to, so far, Jessen has not been redacted.

MR. WARDEN:  That's correct, Your Honor.

THE COURT:  And this is a complete review and

MOTION TO COMPEL                                                68

document setting forth the investigation into the death of Plaintiff Rahman.

MR. WARDEN:  That's correct, Your Honor.

This was the report by the CIA's Deputy Director of Operations.

There was a second report also in the materials from the CIA's Office of Inspector General.  That report, too, is on the list of Category 1, wherein the government has disclosed all of the references in that document to Dr. Mitchell and Dr. Jessen, and the redactions pertain to other subjects.

THE COURT:  Including recommendations made by the two doctors.  That's not been redacted.

MR. WARDEN:  I don't believe so, no.

I think you'll find on perhaps Page 26, there is a lengthy recommendation by Dr. Jessen regarding how Mr. Rahman should be treated.  That page is completely unredacted.

THE COURT:  Yes.  I've read that.  That's unredacted.

MR. WARDEN:  Unredacted.

THE COURT:  And I notice an attachment.

MR. WARDEN:  Yes.  There's a list of documents that are then cited and relied upon in the report.

THE COURT:  Including an unredacted interview of Dr. Jessen.

MR. WARDEN:  Correct.

THE COURT:  And consistent throughout, if I

MOTION TO COMPEL

understand the redaction, is deletion of the names of CIA employees, the location in a foreign country of activities involving Rahman.

Has there been any discussion between you and counsel for the defendants as to utilization of CIA employees, past and present, without identification of their names, using pseudonyms?

MR. WARDEN:  Well --

THE COURT:  Have you and counsel discussed that?

MR. WARDEN:  We discussed that a bit, Your Honor.

As discussed here today, we have enabled them to provide declarations from José Rodriguez and John Rizzo, the Chief of the Counter Terrorism Division and the chief legal officer, the former general counsel.

We had no objection to them deposing a third individual named Jonathan Fredman.  Mr. Fredman, however, objected to his deposition on his own personal Fifth Amendment rights, and defendants didn't pursue that.  But the government didn't pose an objection to that.

We also discussed, as you may recall, Your Honor, the idea a long time ago of the concept of a CIA 30(b)(6) witness, who would likely be anonymous, who could speak to various topics that defendants wanted answered.  The defendants did not agree to that proposal for a variety of reasons.  And so that's basically where we've ended up.

MOTION TO COMPEL                                                70

In our view, we think that the information that Mr. Rodriguez and Mr. Rizzo has provided in connection with all of the documents and in addition to what Dr. Mitchell and Dr. Jessen could provide is certainly sufficient and covers the waterfront of the material issues here in the case.

THE COURT:  Okay.  I now will look at Document 241, Scooter.

(Document handed to the Court.)

THE COURT:  Well, apparently --

Do I understand that the government and counsel for the defendants agree that that's not one of the documents at issue?

MR. WARDEN:  Well, the next on the list is No. 41. So --

THE COURT:  No.  I'm not going to go further with that.  I'm moving to the next category.

MR. WARDEN:  So let me explain Category 2, if I may, Judge.

THE COURT:  Okay.

MR. WARDEN:  Just so we're all clear on what that is.

THE COURT:  Is it on this?

MR. WARDEN:  Yes.  241 is on the chart.  Probably at the very end, I believe.  Maybe the second to the last, I think.

THE COURT:  Okay.

MR. WARDEN:  So what this category represents, Judge,

is in the chart you have in front of you there were a number of privileges that were marked in bold under the column that says *Challenge*. And if a privilege is marked in bold under that column it means that the defendants and the government have agreed that information can be withheld in the document pursuant to that privilege.

And so what Category 2 is are the remaining documents in dispute, where there's agreement regarding the application of the privilege to the information. And so, again, we don't think there's really much of a dispute there. The only question is whether the information falls within the scope of the privilege.

So there are three documents that are listed. The government's position is the information redacted from the document can be withheld on the basis of that privilege in its entirety. And so there really is no dispute. The only question is whether you think it falls within the scope of the privilege.

THE COURT: Well, I've been handed 41. We're talking about 241.

MR. WARDEN: I thought you were jumping to the next category, you said, Judge.

THE COURT: 241.

MR. WARDEN: So 241 is a document where defendants have agreed that the government can withhold state secrets

MOTION TO COMPEL                                          72

information.  This, I believe, is a three-page document.

And, again, for this document in particular we've asserted multiple privileges to cover different information.  But the state secrets is not at issue and we think the state secrets covers the whole thing.

You want 241; correct, Judge?

THE COURT:  241.

(Discussion held off the record.)

(Document handed to the Court.)

MR. WARDEN:  Let me make sure we have the right document here.

THE COURT:  I'm going to mark this document list, Mr. Warden, as Court Exhibit 2 as of today.

(Court Exhibit No. 2 - admitted.)

THE COURT:  And now you'll need to reeducate me on --

MR. WARDEN:  What you're looking at, Judge, is this is a document, No. 241.  We have produced it in partially redacted form to the parties.

This is an e-mail from the year 2003, among CIA officers, discussing interrogation training.  And so there's a cover e-mail on the front.  That's the first document you're looking at.  And it says, Here is the latest draft of an interrogation training course plan.

And so in this document there are the names of CIA officers.  There are the locations of CIA officers.  There's

MOTION TO COMPEL

the location of where the CIA's training will take place. There are the topics that will be covered in the CIA's training course.  And then there is a summary of the proposed training outline, what goals and what subjects will be covered, the dates and specific times of the training, and the location. And we believe all of that information falls within our State Secrets Privilege assertion.

THE COURT:  But then the notation about Drs. Mitchell and Jessen in the p.s., We should give them an opportunity to prepare for their presentation, is unredacted.

MR. WARDEN:  Correct.

THE COURT:  All right.  I've reviewed 241.

Now, a representative document from Category 3.

MR. WARDEN:  Sure.  Let me explain.

So Category 3 we think are the documents that would require a privilege adjudication from Your Honor if you take out the 25 that don't deal with Dr. Mitchell and Dr. Jessen. We think Your Honor can just skip through those.  And then the three in Category 2 should be a very simple review.

No. 3 has information arguably about Dr. Mitchell's and Dr. Jessen's role in the program.  But we have asserted one or more privileges to protect that information.

Why don't we just start with the first one, No. 40 on that list.

THE COURT:  Well, I'm willing to take the time.

MOTION TO COMPEL

We're all here.

MR. WARDEN:  However Your Honor would like to do it.

THE COURT:  Well, it's not --

I have afternoon criminal calendars, as I've told you.  If we need the extra time, we'll recess until Monday.

MR. WARDEN:  Your Honor, the documents --

We have made arrangements for the documents to stay here in Spokane.  You can review them at your -- whenever time permits for you.

We're happy to stay here to talk to you about them if you would like.  We can allow you to review them next week.  We can reconvene and come out to talk to you if you have questions that would be addressed in an *ex parte* matter about specific documents.

Maybe that would be more efficient.  We're happy to come back after you've had time to review it.  It's certainly a lot of information.

THE COURT:  Well, I'm going to be here.

MR. WARDEN:  Sure.

THE COURT:  But I'm just --

If you think in the next half hour we can get through this aspect of it, it may save you all spending the weekend in beautiful downtown Spokane.  You get to look at the 50,000 cubic feet per second falls.

MR. WARDEN:  It is impressive.

Your Honor, we are happy to stay here and go through the documents. I will say it's a large collection of information. It's a large volume. If Your Honor has questions about things that we would have to address in an *ex parte* situation, as you referenced earlier, we would do that.

I think, as I stand here -- again, we've made arrangements for the documents to stay in Spokane. You can look at them, take your time and go through them. We could then reconvene with you if you want to do it *ex parte*, come out and then be prepared to answer any questions you have and do it that way.

That may be more efficient, but however Your Honor wants to do it.

THE COURT: Let me hear from Mr. Paszamant on your view on these documents.

Why don't you come to the podium.

MR. PASZAMANT: Thank you.

Thank you, Your Honor. Working off of the chart that Mr. Warden has prepared and you've now identified as Exhibit 2, which I saw for the first time this morning, defendants' position with regard to Column 3, starting with Document 40, is that, Your Honor, really it would probably be best if you reviewed all of the documents to see what exactly is within those documents. And we don't know that it's as simple as here's, you know, a couple of questions and so on and so forth.

The defendants are happy to come back to participate in a

hearing if that's necessary.

THE COURT:  Well, if this is the matter remaining, it may be that --

As I understand, the documents are going to stay with the FBI here.  Is that what's happening, Scooter?

MR. SLADE:  We've made arrangements for them to stay here.

THE COURT:  What?

MR. SLADE:  Yes, sir.  We've made arrangements for them to stay here.

THE COURT:  I could then have the FBI bring them in. I could go through them, and then possibly we could schedule a telephonic argument.

MR. PASZAMANT:  I would be happy to come back or do it on the phone.  Whatever your preference may be, Your Honor.

THE COURT:  Well, I'm just trying to accommodate.

MR. PASZAMANT:  And we --

THE COURT:  I'm here.

MR. PASZAMANT:  We appreciate that, Your Honor.

But, Your Honor, I think that perhaps there's a disconnect between what the government is representing the defendants are in agreement with versus what the defendants really are in agreement with.

And what I mean by that is, Your Honor, this first column in the grid that's been provided to you -- and, of course,

Document 39 is one of those documents.  Mr. Warden said well, the defendants' names and so on, to the extent they exist in there, have been disclosed.  And we think the state secrets covers everything else in this document.

Well, starting with that latter point.  Until I heard that from Mr. Warden today, the defendants were entirely without any knowledge with regard to all these documents that are listed in Column 1 as to where the State Secrets Privilege begins and ends, as opposed to if you were to look at the document that has been expanded for Your Honor, Document 39.  There's not only the State Secrets Privilege, but also the Deliberative Process Privilege that's been advanced.

THE COURT:  I'm satisfied the State Secrets Privilege applies to the identification of the CIA officers, to the location of the interrogation site, to what country it was located in.

MR. PASZAMANT:  All of which defendants would say we agree, Your Honor.  But looking at Document 39, just as an exemplar.  As Your Honor looked through it, there is page after page of significant redactions.  And it seems that -- to us anyway, and we're --

THE COURT:  Those redactions -- and I read them -- have to do with CIA operations, which I will rule now is privileged under the state secrets assertion by the new CIA Director.

MOTION TO COMPEL                                       78

But we still haven't heard whether that's a completely valid declaration and we haven't discussed whether or not the Attorney General's ratification is required.

MR. PASZAMANT:  So, Your Honor, I'm certainly not second-guessing your determination as to whether things were properly redacted in that Document 39.

Please understand that from our perspective, we just see an awful lot of blanks.  And it seems odd, to say the least, that everything that's under those blanks is properly susceptible to the State Secrets Privilege.

Of course, if Your Honor --

THE COURT:  I reviewed them in Document 39 as being an illustrative exhibit of what's been redacted.

MR. PASZAMANT:  Again, Your Honor, I'm not second-guessing or asking for you to revisit that particular issue.  But just because Your Honor made that determination with Document 39, the same could perhaps not be the case with regard to Document 41, 47, 48, and the remaining documents on this list because --

THE COURT:  Well, except Mr. Warden represents that the redactions are in accordance with the claim of State Secrets Privilege; that being identification of CIA officers or employees, location, and CIA activities.

I think the CIA Act allows for such a claim, Mr. Paszamant.

MOTION TO COMPEL

MR. PASZAMANT:  Well, Your Honor, again, but for Mr. Warden's representation, I didn't hear that until today. And in the grid that we put in front of Your Honor, one of the things that was entirely unclear based upon what we were given and the unclassified summaries is where one privilege begins and the next privilege ends.

So the situation is such that with regard to everything identified within this first column of Exhibit No. 2, that if Your Honor looks at these documents and is satisfied that they fall within the gamut --

THE COURT:  I'm not going to look at each individual document.  On those in Column 3, if in fact there is an argument to be made concerning whether or not the claim of privilege applies to that document, I'm willing, as my time permits -- and I have a hundred-and-some other cases besides this case.  As my time permits, I will look at those documents and give you a ruling as to whether or not the claim of privilege applies.

Let me ask Mr. Warden.  On Category 3 documents --

And you have a copy of this, Lee Ann, as an exhibit?

MR. WARDEN:  Yes, Your Honor.

THE COURT:  All of the claims in Category 3, are those based upon a State Secrets Privilege claim, as opposed to predispositional discussions or attorney/client discussions?

MR. WARDEN:  Yes, with an explanation, if I may, Your

MOTION TO COMPEL

Honor.

THE COURT:  Okay.

MR. WARDEN:  So some of the documents in category --

The State Secrets Privilege we have asserted with respect to all of those documents.  The State Secrets Privilege in some instances covers all of the information in the document; but in other instances, for example, we have --

There are several draft documents that we have withheld in full.  If you think about it like there's kind of an umbrella privilege over a draft that we say is protected by the Deliberative Process Privilege.  Because it's a draft, it is not required to be disclosed.

If Your Honor were to reject that assertion, then there would within that document be state secrets information that we would withhold, such as the names and operations and that type of thing.

So you have multiple layers of privileges covering the same information.  That's what we tried to explain in our declarations, to identify with as much specificity as we could the types of information that were being withheld subject to each of the privileges.

And, again, we're happy to walk you through the documents, as needed, if you have questions.

THE COURT:  Give me the one you pick out as being illustrative of what you just told me, Mr. Warden.

MOTION TO COMPEL                                          81

MR. WARDEN:  Okay.  Hold on.  Let me --

THE COURT:  All right.

MR. WARDEN:  Give me a moment, please.

THE COURT:  Okay.

(Pause in proceedings.)

MR. WARDEN:  Why don't we --

I'll give you a short one to make it easy.  No. 197.

(Document handed to the Court.)

MR. WARDEN:  So, Your Honor, if I may explain what you're looking at there.

I actually don't have a copy of that.  That was one of the documents withheld in full.  It's in our classified submission.

So that document, Your Honor, is a draft e-mail -- or an e-mail, excuse me, that copies below it a draft CIA cable. That's a communication between CIA stations.

So it's a draft, as you can see if you read the e-mail. And they're asking for comments and authorization before sending the cable, and asking others within the CIA to authorize it and approve it.

The cable itself then discusses staffing and personnel requirements at one of the detention facilities where Abu Zubaydah was detained.  And I believe it mentions Dr. Mitchell and Dr. Jessen therein.

So that's an example.  Because it reflects a draft deliberative communication, we have withheld the entirety of

MOTION TO COMPEL

the document in full.  If, however, that were to be denied, then there is, as you can see, names and other types of state secrets information within that document.

THE COURT:  And this is from a CIA operative?

MR. WARDEN:  Yes.  That's a communication among CIA officers, yes.  And so their names are in the documents and in the e-mail, yes.

THE COURT:  And, Mr. Paszamant, why wouldn't a discussion about interrogation principals, interrogation subjects, without any mention of Drs. Jessen and Mitchell, why wouldn't that fall within the state secrets category?

And, as I have indicated, the CIA Act, I believe, particularly under the Ninth Circuit rulings --

The discussions among CIA operatives as to how they're going to interrogate or prepare for the interrogation of one of these so-called high-value personnel, why doesn't that fall within state secrets and the CIA Act?

MR. PASZAMANT:  Well, the first question, Your Honor, is:  Is the information secret or has that information already been disclosed, either through the SSCI report or any number of other documents that have already been disclosed?

Lying at the heart of this case -- and you heard it from plaintiffs' counsel earlier -- was this notion that, as I understand the plaintiffs' theory, Zubaydah was a test subject. It was a test subject for the defendants, to determine whether

MOTION TO COMPEL

they ought to employ this technique versus some other technique.  And then later on, that which they recommended for Zubaydah was somehow extrapolated to the plaintiffs, none of whom were high-value detainees.

There was no program here the way plaintiffs want you to understand that term.  There was a high-value detainee program.  My clients weren't involved in that.

THE COURT:  The plaintiffs aren't complaining about the withholding of these documents.

MR. PASZAMANT:  But that's just the point, because they like the conflation of one big program.  There was no one big program.  So if you look at the minimal information that I have --

THE COURT:  Of course, your clients can testify to that.

MR. PASZAMANT:  My clients can, in fact, testify to the fact that they were only involved in the HVD program.  But if Your Honor --

THE COURT:  And Rizzo and Rodriguez can so testify.

MR. PASZAMANT:  To a point, Your Honor.  Although they were and presumably will be crossed as to their personal knowledge of these very things, which brings us back to Haspel and Cotsana.  They can speak to the granular in ways that these other gentlemen can't.

Now, Your Honor, I don't have the information, of course,

that you have, this document being withheld from us in full. But if you look at the little information I do have, I know that it's a May 2002 e-mail that talks about the future makeup of the team, whatever that means. But this is the formative period where Zubaydah has been captured. He's been subjected to certain things. This is well in advance of when my clients propose any sort of EITs.

THE COURT: Well, you have that information, that date.

MR. PASZAMANT: I have the date, Your Honor. That's true. But there's not a whole lot I can do with simply a date and no document. So when it's all said and done, what --

Again, I don't know where state secrets begins and ends on this document versus deliberative process. But I would suggest to you that when we're talking about Zubaydah -- and he lies at the core of this -- what happened to him, how it happened to him, why it happened to him, who decided it should happen to him, these are all things that are disclosed in this case and they're in the public domain. So to now say but it's a state secret --

THE COURT: How are they in the public domain? How is this document in the public domain?

MR. PASZAMANT: That particular document is not. It's a question of the subject matter, Your Honor.

THE COURT: All right. My ruling is that

MOTION TO COMPEL

Document 197 is properly within the State Secrets and CIA Act Privilege.

MR. PASZAMANT:  The entirety of the document, Your Honor?

THE COURT:  Yes.  Other than --

The entirety to the extent that it's redacted, which is the discussion.

MR. PASZAMANT:  Your Honor, I have none of this document.

THE COURT:  Well, you have, do you not, the author and date?

MR. PASZAMANT:  I have exclusively:  May 2002 e-mail, Eyes Only, Future Makeup of Team.

THE COURT:  Yes.

MR. PASZAMANT:  That's what I have.  Nothing more.

THE COURT:  Well, I've reviewed it, and my judgment and decision is that the privilege is properly invoked as to that document.

MR. PASZAMANT:  Okay.  Your Honor, I accept that.

THE COURT:  Well, I have to make the rulings on them.

MR. PASZAMANT:  Understood.

THE COURT:  Was that to be --

With that discussion and that ruling will counsel be able to sit down and go through this list?  Or is it something you want me to spend the time on?

MR. WARDEN:  Your Honor, we're here today.  We can go through as much as we can and continue the proceedings.

My thought was that --

THE COURT:  I think that's a good idea.  Because I'll be after the noon recess dealing with my criminal calendar. And that will give you the opportunity to discuss the documents in Column 3 and my ruling today -- or this morning.  And then I will be available this afternoon later, after the criminal calendar.

What's your estimate on that, Lee Ann?

(Discussion held off the record.)

THE COURT:  My best estimate would be 3:00 or 3:30, I would become available this afternoon.

MR. PASZAMANT:  Your Honor, I'm happy to engage in a dialogue with Mr. Warden.  We have had lots of dialogues over the course of this case.

Ultimately, Your Honor, it seems to me that it behooves us to have you look at the documents in this particular column so that you can do as you just did with regard to Document No. 197 and make a determination as to whether, in fact, you think that the state secrets, if they've asserted it, involves the whole document or whether it doesn't.

Because to the extent that it relies on deliberative process -- and there are lots of documents that speak only to deliberative process -- it's a different analysis.  There's a

MOTION TO COMPEL                                            87

balancing that takes place there.

THE COURT:  Which ones rely upon deliberative process?

MR. PASZAMANT:  So, Your Honor, based upon my -- Well, many of the documents identified in the third column identified deliberative process along with the State Secrets Privilege, as I leaf through them quickly.

THE COURT:  But I'm asking for any that are just deliberative process.

MR. PASZAMANT:  That's what I understood, Your Honor. So the documents that remain in dispute that rely on the deliberative process without the State Secrets Privilege, the CIA Act, and the NSA act, based upon my notes are 117, 139, 159, 167, and 206.

THE COURT:  Well, but that's not in the third column.

MR. PASZAMANT:  Well, again, Your Honor, I don't know from the third column any more than what I've heard today.  I don't know why it's not in the third column.  If I look at --

THE COURT:  I thought Column 3 were documents that require review by the Court or agreement of counsel and a ruling by the Court.

MR. PASZAMANT:  Your Honor, again --

THE COURT:  At least that's what Mr. Warden said.

MR. PASZAMANT:  Yes.  And I'm as good as what he said, Your Honor.  And I recognize earlier you said well, they

don't -- in connection with the state secrets, they don't talk about the defendants; or to the extent that the defendants are identified, their names have been disclosed.

Of course, the problem with that potentially is taking it entirely out of context. So we have what the defendants may have said or done, but nobody else. And that's critically important information.

And, you know, I recognize that Your Honor has made a ruling on that. But I just wanted to afford you that additional piece of information, at least from my perspective.

So in terms of why things are allocated within these various columns, Your Honor, like I said, I'm as good as what Mr. Warden said earlier today and no better. So my --

You know, if I look at some of those documents that I just rattled off --

So 117. Okay. That looks like it's in the state secrets first column. So that document, based upon --

THE COURT: What I think I'm going to do, Mr. Paszamant, is take a noon recess before I start the afternoon criminal calendar and allow you gentlemen to meet, whether you want to do it now or you want to go to lunch and come back to the attorneys room.

MR. PASZAMANT: So, Your Honor, does it make sense to simply have you review the 19 documents and then just have a telephonic hearing next week?

THE COURT:  No.  I want you first to spend the time together, based upon my ruling.

MR. PASZAMANT:  Okay.

THE COURT:  And our attorneys room will be available, won't it, Lee Ann?  The attorneys room.

COURTROOM DEPUTY:  I believe so.  I'll open it.

THE COURT:  It will be available if you work with Ms. Mauk on that and get her permission.

And then this afternoon when you're ready to agree or ready to disagree, come back, notify me as to what you've resolved; which ones you've resolved, which ones you have not.

And it may well be that if you do that now and forgo lunch and come back, say, at 1:30, that I can give you a half hour at that time.

Is that all right?

MR. WARDEN:  Your Honor, Andrew Warden for the government.

We have no objection to Mr. Paszamant's initial suggestion; that we will leave all the documents here in Spokane, you can --

THE COURT:  Yes.  But, you see, you want to just say throw those on the judge's desk and whenever he gets through reading them all, whether we could agree or disagree in view of his earlier ruling.

I'm not about to do that.  I'm telling you we have an

MOTION TO COMPEL                                                    90

attorneys room for you to sit down, in view of my ruling on 197, and determine which, if any, you can agree to and which ones you can legitimately not agree to, and then come back.

And if there are unresolved documents, we'll leave those documents here in Spokane. And when I have time to get to them, I'll read them. And then we'll schedule a telephonic call.

MR. WARDEN: That's very good, Your Honor. We will try to narrow it down even further, to the extent we can.

THE COURT: All right. We'll be in recess.

The plaintiffs can stay or not. That's your choice.

Go ahead. You're all excused.

(Recess was taken at 11:46 a.m.)

LAW CLERK: All rise.

Court is reconvened.

THE COURT: Just be seated.

All right. Who drew the short straw having to report on the status of Column 3?

MR. WARDEN: Andrew Warden from the Department of Justice, Your Honor.

I come to report good news. Based on our consultations --

THE COURT: Let me see the exhibit, please.

(Document handed to the Court.)

THE COURT: All right. Go right ahead.

MR. WARDEN:  Based upon our consultations over the recess, Judge, we have narrowed the number of documents that you need to look at to only eight.  Eight total documents.

Let me put on the record what those eight documents are and specifically what we're asking the Court to rule upon, because we did reach some accommodations in terms of what was actually in dispute.

So, first, we have one document where the assertion of the State Secrets Privilege is in dispute.  That is Document No. 40.  And so we would ask the Court to look at that and consider the government's State Secrets Privilege assertion.

Second, Your Honor, we have five documents where the government has asserted the Deliberative Process Privilege over the document in whole or in large part.  And the only thing we're asking the Court to do with those documents is determine whether the Deliberative Process Privilege applies.

If it does, then the document will stay in its currently redacted form.  If it does not and you rule against the government on that privilege assertion, we would reprocess the document and produce it in a lesser redacted form to the defendants, with minor redactions likely to state secrets information.  So they're not --

There's no dispute that the government could withhold the state secrets information.  It's only a dispute about the deliberative process.  So the Court only needs to adjudicate

whether the Deliberative Process Privilege applies.

Those numbers are 103, 157, 158, 46, and 137.

The final document, Your Honor, is No. 165.  That was a document withheld in full based on the attorney/client privilege.  And that is the only privilege we're asking Your Honor to address.

If, again, you rule in the government's favor on that, the document will stay in its current form.  If you rule in the defendants' favor on that document we, the government, would reprocess it and produce the unclassified information therein, but would take redactions to state secrets.

So we've got eight documents left.  Everything else we've been able to reach resolution on about Your Honor's involvement.

Seven documents.  Excuse me, seven.

THE COURT:  Well, I'll give you an opinion.

I've already indicated orally that I believe the CIA Act and the state secrets claims are well founded.  I will give you a written opinion in writing.  And I'll look at these next week, as my time permits.  And I will rule without further oral argument.

I want to call your attention, I'm sure it already is directed, to the final scheduling order after prior continuances.

Dispositive motions are to be filed and served on or

MOTION TO COMPEL                                            93

before May 22nd of 2017.  There's the designations.  All unresolved substantive or evidentiary issues to be addressed by motions in limine not later than July 11th, 2017.  Trial briefs, requested jury instructions, requested jury voir dire to be served and filed on or before August 1st.

Pretrial conference in Spokane August 21st of 2017.  Jury trial September 5th of 2017.

MR. PASZAMANT:  May I be heard for just 30 seconds, Your Honor?

THE COURT:  All right.

MR. PASZAMANT:  Thank you.

Your Honor, the defendants are in agreement with what Mr. Warden just conveyed to you.

With regard to the other documents that are identified in this third column of Exhibit No. 2, the defendants heard what you said earlier with regard to your ruling on Document No. 197.  And Mr. Warden has represented that the remaining documents that were not identified for you would be similar.  And as a result of that, we would simply like to note our objection on the record with regard to those documents that are in Column 3 that are not within those documents that Mr. Warden just articulated we're asking Your Honor to consider.

THE COURT:  All right.

MR. PASZAMANT:  Thank you, Your Honor.

THE COURT:  Now, I just hope that counsel will keep

in mind my continuing suggestion that the federal government and the federal taxpayers, including everybody in this room, I assume, are paying the complete defense cost and have agreed to indemnify against any loss.

I speak for the families of the decedent and for the plaintiffs, to the extent that it is in their best interests, along with the taxpayers' best interests, that counsel and whoever has the authority to speak for the government sit down and seriously discuss appropriate resolution of this case. On the merits it's no more difficult than any other personal injury and wrongful death case that I've handled through the years.

All right. I'll enter an order.

And, Scooter, you'll leave these files. And they'll be available to me at the FBI office. I'll try to get to it next week.

All right. You're excused.

MR. PASZAMANT: Thank you, Your Honor.

MR. SCHUELKE: Thank you, Your Honor.

MR. TOMPKINS: Thank you, Your Honor.

MR. LADIN: Thank you, Your Honor.

MR. WARDEN: Thank you, Your Honor.

(Recess was taken at 1:36 p.m.)

REPORTER'S CERTIFICATE

I, Dorothy Stiles, Official Court Reporter for the United States District Court for the Eastern District of Washington, do hereby certify:

That I reported on the Stenograph machine the proceedings held May 5, 2017, in the matter of SULEIMAN ABDULLAH SALIM, MOHAMED AHMED BEN SOUD, and OBAID ULLAH, *as personal representative of Gul Rahman* vs. JAMES ELMER MITCHELL and JOHN JESSEN, *also known as* Bruce Jessen, Case No. 2:15-CV-0286-JLQ / 2:16-MC-0036-JLQ; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1 through 94) is a true and accurate record of said telephonic proceedings.

This the 19th day of May 2017.

/s/ Dorothy Stiles, RMR, CRR
Official Court Reporter